UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

|   |   |   |
|---|---|---|
| UNITED STATES, | : | CASE NO. 1:18-cr-672 |
| Plaintiff, | : | ORDER |
|  | : | [Resolving Doc. 20] |
| vs. | : |  |
| JULIUS D. RUFFIN, | : |  |
| Defendant. | : |  |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

A federal grand jury indicted Julius Ruffin for possessing with intent to distribute roughly 100 grams of a heroin and fentanyl drug mixture.[1] Law enforcement officers recovered the drugs from Ruffin's rectum after obtaining a warrant for the search. Ruffin moves to suppress the drugs as evidence on Fourth Amendment grounds.[2]

For the following reasons, the Court **DENIES** Defendant Ruffin's motion to suppress.

## I. Background

On October 19, 2018, law enforcement pulled Defendant Ruffin over on the highway. During the preceding eight hours, an anonymous source had given law enforcement real-time information and observations detailing a drug transaction between Ruffin and Mexican drug traffickers and suggesting that Ruffin had concealed the drugs in his rectum. Finding no drugs during a search of Ruffin's vehicle, the officers sought a warrant to search Ruffin's body cavities. The supporting affidavit relied heavily on the

---

[1] Doc. 1.
[2] Doc. 20. The government opposes. Docs. 22, 23. Ruffin replies. Doc. 25. The Court held a suppression hearing on January 28, 2019. Doc. 26. The hearing transcript will be cited as "Hearing Tr."

Case No. 1:18-cr-672
Gwin, J.

source's information.

Defendant Ruffin argues that the affidavit did not show probable cause for the body cavity search and that the search performed was unreasonable.

The following summarizes the Drug Enforcement Administration ("DEA") Task Force Officer's affidavit. [3]

### A. The Affidavit Supporting the Body Cavity Search Warrant

On October 19, 2018, a Source informed the affiant DEA officer and two Lorain officers that Julius Ruffin was going to drive the Source from Lorain, Ohio to a Columbus, Ohio residence, where Ruffin would buy 200 to 250 grams of heroin from Mexican drug traffickers.

At about 12:10 p.m., the Source told the officers that s/he and Ruffin had just started the trip to Columbus and that s/he would be in contact with the investigating officer(s) during the drive. The Source said they drove in a black Saab SUV with a specific Ohio license plate number.

A few hours later, the Source told the officers that the Source and Defendant Ruffin were fifteen minutes from a specific Edmonton Road, Columbus address. Law enforcement went to the Edmonton Road address to surveil and soon saw Ruffin and the Source approach and enter the Edmonton Road residence.

After another few hours, the surveillance team saw "two unknown Mexican males" in a white BMW with a specific Ohio license plate number arrive and enter the residence. Shortly after, they saw the two unknown Mexican men leave the residence and drive away.

---

[3] Doc. 20-1.

Soon after, the Source told the officers that while in the Edmonton Road residence s/he saw a drug transfer between Ruffin and the Mexicans; that Ruffin was squeezing a plastic bag of heroin he had just purchased from the Mexicans; and that Ruffin had told the Source that he needed to go into the bathroom before leaving the residence. According to the Source, Ruffin entered the bathroom with a sandwich-bag type of plastic bag and exited twenty minutes later with nothing in hand. Ruffin then left the residence.

Upon seeing Ruffin drive away in the Saab, the surveillance team followed him and received Ohio State Highway Patrol Trooper help. The State Trooper pulled Ruffin over for minor traffic violations. A search was performed after a K-9 alerted to Ruffin's vehicle. Other than the dog alerting, the vehicle search did not find drugs.

The State Trooper Mirandized Ruffin and questioned him. The DEA and Lorain officers helped, as they suspected that Ruffin had hidden the drugs in his body.

## B. The Body Cavity Search Warrant and the Performance of the Search

The State Trooper detained Ruffin at 8:20 p.m.[4] Sometime after, the officers sought the search warrant and held Ruffin at a local police station until they obtained the search warrant.[5] Shortly after midnight, a Mansfield Municipal Court Judge issued a warrant authorizing a body cavity search.[6]

Ruffin arrived at the hospital shortly after 1 a.m.[7] Ruffin was not in pain or distress, and Ruffin denied having any drugs in his body.[8] Ruffin did not consent to the search.[9]

---

[4] Doc. 20-3 at 3.
[5] Hearing Tr. at 47–48; Doc. 20-3 at 3.
[6] Doc. 20-2 (authorizing a "[s]earch to include an inspection of the genitalia, buttocks, and or undergarments and body cavities that is preceded by the removal of all clothing").
[7] Doc. 25-1 at 10–13; Hearing Tr. at 49.
[8] Doc. 25-1 at 1–2, 8, 10.
[9] Hearing Tr. at 49, 51.

A nurse manually examined Ruffin's rectum.[10] At about 1:30 a.m., she conducted a digital rectal exam to see if she could feel anything in his anal cavity and then used a speculum to check if she could see anything. The parties disagree as to whether the nurse felt or saw anything during the exams[11] but agree about the result: she was not able to retrieve any foreign object. After the nurse relayed this to Ruffin's treating physician, Dr. Jeffrey Revill, Dr. Revill ordered an x-ray to assess whether drug bags could be present.[12]

Dr. Revill believed that three distinct circular masses from the x-ray were foreign objects.[13] At 1:45 a.m., Dr. Revill ordered the nurse perform soap suds enemas on Ruffin until the objects flushed out.[14]

At 2:55 a.m., after multiple enemas, Ruffin finally released "3 saran wrap bags tied filled with white hard substance."[15] These weighed about 120 grams.[16]

On November 9, 2018, a federal grand jury indicted Ruffin for possessing with intent to distribute a heroin and fentanyl drug mixture. Ruffin moves to suppress the drug bags.

## II. Discussion

### A. Whether the Affidavit Established Probable Cause for the Body Cavity Search

Defendant Ruffin argues that the officer's affidavit did not establish probable cause

---

[10] Doc. 25-1 at 6.

[11] According to Ruffin, the nurse explicitly stated that she could not feel anything and that, as a result, the officers insisted she try using a speculum. Hearing Tr. at 52. The nurse's notes, however, say that she "could feel something in [Ruffin's] anal cavity," and that, when using a speculum "to attempt visualization," she saw a foreign object "looking like a piece of plastic wrap." Doc. 25-1 at 6. Dr. Revill does not seem to have been aware of, or seem to credit, the nurse's account.

[12] Doc. 25-1 at 6; Hearing Tr. at 13–14, 17–19, 21, 25, 38–39.

[13] Hearing Tr. at 13–14; Doc. 25-1 at 5.

[14] Doc. 25-1 at 5; Hearing Tr. at 12, 35.

[15] Doc. 25-1 at 4. The nurse's notes say two enemas, *id.*, while Ruffin recalled four, Hearing Tr. at 55.

[16] Doc. 25-1 at 4.

Case No. 1:18-cr-672
Gwin, J.

for the warrant to search Ruffin's body cavity for drugs. Probable cause exists when the circumstances and facts show a fair probability (1) that an offense has been committed and (2) that evidence thereof will be found in the place to be searched.[17]

Because the affidavit relies on a partially corroborated informant's tip, the Court uses the totality-of-the-circumstances approach to assess the informant's "veracity, reliability, and basis of knowledge."[18] Because the affidavit does not say that the Source has given past reliable information, whether the affidavit sufficiently supported the magistrate's probable cause finding turns on whether the affidavit gave other adequate bases showing the Source's reliability and adequately showing probable cause.[19] Moreover, where the affidavit fails to name the informant—as is the case here—the informant's tip deserves additional scrutiny.[20]

The Supreme Court's *Illinois v. Gates* decision is instructive. In *Gates*, an anonymously written letter informed police that Lance and Sue Gates, an Illinois couple living in a specific condominium complex, trafficked marijuana and had about $100,000 of marijuana in their basement.[21]

The Court found that the warrant affidavit, though relying on the partially corroborated anonymous letter, gave an adequate basis for probable cause to search the Gates' home and car because police independently corroborated details of the anonymous

---

[17] *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Peffer v. Stephens*, 880 F.3d 256, 263–73 (6th Cir.) (citation omitted), *cert. denied,* 139 S. Ct. 108 (2018).
[18] *United States v. May*, 399 F.3d 817, 822 (6th Cir. 2005) (quoting *Gates*, 462 U.S. at 230).
[19] *See United States v. Dyer*, 580 F.3d 386, 390–91 (6th Cir. 2009) ("[I]n the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration.").
[20] *May*, 399 F.3d at 823 (explaining that statements from named informants, if fabricated, would subject them to criminal liability, while the same is not true of unnamed informants (citing *Gates*, 462 U.S. at 233)).
[21] *Gates*, 462 U.S. at 225.

Case No. 1:18-cr-672
Gwin, J.

informant's tip.[22] Their investigation revealed facts "as suggestive of a pre-arranged drug run" as an ordinary vacation and that the tip correctly predicted Lance would soon fly to Florida and drive north to Illinois in the family car (which was conveniently waiting for him).[23]

In the present case, the government argues that the Source correctly predicted "that something [was] going to happen," thus showing the Source's reliability.[24] Law enforcement corroborated the car description, the Lorain-to-Columbus drive (using travel/arrival times), the Edmonton Road residence address, and Ruffin and the Source together arriving there. Pertinent to showing a fair probability that Ruffin committed the drug offenses, police observed activities that were vaguely consistent with a drug transfer. Two men[25] arrived and entered the residence and then left shortly after arriving. Soon, Ruffin also left the residence and drove north on the highway back towards Lorain.

Viewed independent of the tip, these are all innocent activities that are less suspicious than Lance Gates' flight to Florida, oddly short motel stay, and immediate return to Illinois in the family car.[26] The corroborating evidence also is less "independent"; the Source was with Ruffin during the events, making many of the occurrences much easier to predict.[27] At the same time, the Source's real-time updates and descriptive first-hand observations deserve greater weight because they show the Source's personal knowledge.

---

[22] *Id.* at 241–46.
[23] *Id.* at 243–44.
[24] Hearing Tr. at 65. *See also id.* at 65–74.
[25] The affidavit refers to these men as "two unknown Mexican males," per the Source's tip. However, the affidavit gives no independent information suggesting they were of Mexican nationality.
[26] *Gates,* 462 U.S. at 245 n.13 (noting that the affidavit gave an adequate basis for the informant's reliability despite the police corroborating only seemingly *innocent* activities that became suspicious in light of the tip).
[27] *See id.* at 245 ("[T]he anonymous letter contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.").

Case No. 1:18-cr-672
Gwin, J.

This somewhat compensates for the corroboration deficiencies.[28]

Although the affidavit may have sufficiently shown a fair probability that Ruffin committed the alleged drug offenses, it is far from clear that it has shown a fair probability that evidence would be found in the place to be searched—that is, Ruffin's rectum. The only evidence seems to be the Source's observations of Ruffin's post-drug transaction bathroom visit.

Though these observations create some inference that Ruffin concealed the drugs in his rectum, the affidavit gives almost no independent corroboration. The statement that a search was performed after the K-9 alerted to Ruffin's car—implying that the officers did not find the drugs in the car—appears to be the only corroborating evidence.

This may not be enough. Basic fairness requires the government to present stronger-than-usual support to justify such a necessarily invasive body search.

The Court need not resolve this difficult question, however, because the *Leon* good-faith exception would apply even if the affidavit did not sufficiently show probable cause for the search.

This Leon exception to the exclusionary rule applies to evidence that officers "seize[] in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."[29] An officer does not reasonably and in good faith rely on a warrant when the affidavit is "so lacking in indicia of probable cause as to render official belief in its

---

[28] *See id.* at 234 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case.").

[29] *United States v. White,* 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Leon,* 468 U.S. 897, 905 (1984)). The proper test of an officer's good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *Id.* (citation omitted).

existence entirely unreasonable."[30] When an affidavit gives insufficient information supporting an informant's reliability to show probable cause, the Court focuses the inquiry on the extent of officers' efforts to corroborate the informant's allegations.[31]

In this case, the real-time nature of the Source's tips made corroborating the alleged drug offenses and Ruffin's concealment of the drugs quite challenging. Even so, the officers made meaningful efforts to independently investigate both through surveillance, other search methods, and questioning. The Court finds that the good-faith exception applies, as the affidavit was not "so lacking in indicia" of probable cause that the officers' reliance on the warrant was unreasonable and not in good faith.

### B. The Body Cavity Search Performed Was Reasonable

Ruffin also argues that the methods used to perform the body cavity search were unreasonable. Body searches implicate "significant, constitutionally protected interests" and thus deserve greater scrutiny.[32] In deciding whether an anal cavity search is reasonable, the Court considers "(1) the extent to which the procedure may threaten the safety or health of the individual, (2) the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity, and (3) the community's interest in fairly and accurately determining guilt or innocence."[33]

Two Sixth Circuit decisions have opined on the reasonableness of non-consensual

---

[30] *May*, 399 F.3d at 826 (quoting *Leon*, 468 U.S. at 923).

[31] *See United States v. Weaver*, 99 F.3d 1372, 1380–81 (6th Cir. 1996) (declining to apply the good-faith exception because the detective made no meaningful effort to corroborate the informant's report that an individual was growing marijuana in their home); *United States v. Washington*, 380 F.3d 236, 241–43 (6th Cir. 2004) (discussing *Weaver* and *United States v. Leake,* 998 F.2d 1359 (6th Cir. 1993))).

[32] *Missouri v. McNeely*, 569 U.S. 141, 159 (2013). The medical staff who examined Ruffin are state actors for Fourth Amendment purposes. *See United States v. Booker*, 728 F.3d 535, 537, 540–45 (6th Cir. 2013).

[33] *Booker*, 728 F.3d at 546 (quoting *Winston v. Lee,* 470 U.S. 753, 761–62 (1985)) (internal quotation marks omitted).

Case No. 1:18-cr-672
Gwin, J.

anal cavity search methods performed on persons suspected of concealing drugs. The circumstances of this search fall squarely between them.

In *United States v. Booker*, an ER doctor performed a digital rectal exam that involved partially paralyzing and intubating the detainee against his will.[34] The Sixth Circuit found the warrantless search to be unreasonable because it posed some medical risk to the detainee, seriously invaded his dignitary interests, and seemed unnecessary given that less intrusive investigative methods, like first taking an x-ray or obtaining a warrant, were also available options but not used.[35]

By contrast, in *United States v. Banks*, officers followed the ER doctor's medical guidance and instructed the detainee to take laxatives and an x-ray; eventually, the detainee "voluntarily" released the drug bags.[36] The Sixth Circuit found the search to be reasonable because it posed no threat to the detainee's health, it involved the exact methods proposed as alternatives to the unreasonable *Booker* search methods (warrant, x-ray, and laxative), and limited other evidence was available to show the detainee's guilt of drug trafficking.[37]

In the present case, the Court believes that the three factors weigh slightly in favor of the search's reasonableness.

First, the rectal exams, x-rays, and enemas posed little to no risk to Ruffin independent from the obvious dangers Ruffin accepted by concealing drugs in his rectum.

Second, the search performed was more offensive to dignitary interests than the x-

---

[34] *Id.* at 539–40.
[35] *Id.* at 546–48.
[36] *United States v. Banks*, 684 F. App'x 531, 534 (6th Cir. 2017).
[37] *Id.* at 537.

ray and laxative *Banks* search, as it involved bodily penetration, and it included a manual rectal exam like the search that *Booker* found to be unreasonable. The *Booker* search, however, is distinguishable because the court largely focused on the forcible paralysis and intubation during the manual rectal exam and explicitly declined to extend its holding to the "materially different" scenario of a search authorized by a court order.[38] Here, we have no forcible incapacitation and a search warrant.

The third factor helps and hurts Ruffin's case. As in *Banks*, limited other evidence showed Ruffin's guilt of drug trafficking.

However, it seems illogic that the x-ray—the least intrusive method—was not the first method used. Although Dr. Revill eventually ordered the x-ray to assess whether there appeared to be drug bags masses in Ruffin's rectum, he did so *after* Ruffin had already endured manual rectal exams—the *most* intrusive methods. Taking the x-ray and evaluating the x-ray took only about fifteen minutes, start to finish.

The x-ray examination was available and potentially could have eliminated any need for anal penetration.[39]

Nonetheless, considering the methods' minimal safety risks, the authorized search warrant, the absence of forcible incapacitation, and the limited other sources of evidence, the balance of the factors still narrowly favors the reasonableness of the search. The Court finds that the anal cavity search performed on Ruffin was reasonable.

---

[38] *Booker*, 728 F.3d at 547.

Case No. 1:18-cr-672
Gwin, J.

## Conclusion

For the reasons stated, the Court **DENIES** Ruffin's motion to suppress.

IT IS SO ORDERED.


Dated:  February 12, 2019            *s/       James S. Gwin*
                                      JAMES S. GWIN
                                      UNITED STATES DISTRICT JUDGE